The next case on our calendar is United States v. Timmy Wallace. May I proceed, Your Honor? May I proceed? Please proceed. Yes. Good morning, Your Honors. May it please the Court. My name is Jonathan Edelstein, and I have the honor of representing the defendant appellant, Timmy Wallace. At 7.22 p.m. on November 12, 2015, the arresting officers had all of the information necessary to complete the lawful purpose of a traffic stop. They had done a rugby search, which is a search that includes every database in the NYPD, and it was conceded at the suppression hearing that this rugby search established at 7.22 p.m. The car was not stolen. It was registered to Mr. Wallace. The VIN number matched. Mr. Wallace had a valid license, no warrants. They knew he was the owner of that car at 7.22. That's your argument, correct? It's not only my argument. It is admitted by Sergeant Alston that as of 7.22, this rugby search revealed that this was not a stolen car. It's not clear who ran that report, right? And you rely on the collective knowledge doctrine to say that if any of the officers knew the results of the report, the knowledge can be imputed to all the others. But doesn't United States v. Cologne explain that collective knowledge doctrine permits one officer to conduct a search in reasonable reliance on the instructions of another, not that if one officer has information that might negate reasonable suspicion, that knowledge is imputed to all other officers at the scene? Well, Your Honor, first of all, we're not relying solely on the collective knowledge doctrine. Although the officers, none of them admitted to doing the rugby search. First of all, they all admitted to knowing that a rugby search was done. So every one of them knew that the rugby was there and that a search had been completed. Second of all, Sergeant Alston testified without any contradiction that this data that came up in the rugby search was something that an officer would have reviewed right away. So the practice of the NYPD was that this information would be immediately known to the officer. So it can be inferred from that, especially since there was no contrary testimony, that these officers did know that the purpose of the search was completed, not to mention that if this Court were to accept that the collective knowledge doctrine doesn't apply here or that these facts that I just set forth do not support an inference, then all that any officer would have to do to avoid suppression is deny that he was the one who made the search. And I would submit, actually, that given the officers' very clear recollection of everything else about the stop, that their refusal or failure to admit who did the rugby search was a little bit cagey. Well, the District Court credited the testimony of the officers. And here this was just a search of the door jam. The officers weren't searching the whole car, right? And doesn't class tell us that it's permissible to search, to look at a VIN as part of a standard traffic stop? Well, as part of a standard traffic stop, Judge, I think those are the key words. It's not permissible to continue looking after the standard traffic stop is done. Moreover, Officer Haskovic testified he was not looking at this VIN as part of a standard traffic stop. The reason he looked for this door jam VIN was because he believed the car might be stolen, which seven minutes before he searched the door jam VIN, the officers admittedly knew that it was not. So- It wasn't stolen even though it had the marks on the door and other indicia of a problematic vehicle. They knew it was his vehicle and that it wasn't stolen at 722 allegedly. Not allegedly. Sergeant Alston admitted this, that at 722- Oh, yes, I submit that it is prohibited by Rodriguez, that Rodriguez made very clear in unmistakable terms that prolongation of a stop, even in a de minimis way, is not permitted under the Constitution. And that going to this issue of the alleged tool marks on the door, they not only knew that this car was owned by Mr. Wallace, but they saw that he had the keys. So obviously, you know, that he did not need to make a forced entry to this car. They saw a Papa John's sign. There was a pizza on the seat. They knew exactly what Mr. Wallace was doing. There was no basis for them to go further and continue to look for a stolen car, which they already knew was not stolen. And certainly, Officer Haskovic, saying that under his training and experience, a so-called VIN swap can happen, doesn't- I'll ask you a question about the opinion below, and I will ask it to the government as well. The district court said that one of the main issues was whether there was sufficient information in possession of the officers by 722 or so to mean that they should never have proceeded to the next step. She said that, but then it doesn't actually appear in the opinion, does it? The main issue is never really answered in the opinion, unless the government could point me to where I may have missed it. Correct, Your Honor. I have read that opinion with a fine-tooth comb many times, and I did not find any place where that issue was addressed at all. Thank you. And returning again to the issue of the VIN swap, which is why Officer Haskovic claimed that he continued the search, the knowledge that VIN swaps can happen does not amount to reasonable, articulable facts showing that a VIN swap has happened here. And the Caro case in the Tenth Circuit, which I would urge this Court to adopt, made that point very clear, that just knowing VINs can be altered does not allow continuation of a stop in the absence of any evidence that the VIN had been tampered with, and here there was none. But here you have the marks on the door. You have the black tape, the sort of unusual way in which the registration form is taped on. You have some of the numbers missing from the VIN, not on the dashboard, but on the registration form, as I understand it. And you have the district court saying she didn't find credible the reason given for why those numbers were missing. The district court never made any findings as to why the numbers were missing. And the officers, I believe, actually no, I don't believe, the officers did agree that there was water damage on the registration. And even if these signs had been, even if in the absence of a rugby search, these signs would have amounted to suspicion, they certainly didn't amount to reasonable suspicion after the rugby search revealed that this was not a stolen car, that the dashboard VIN matched, certainly the visible numbers on the registration also matched what was on the dashboard VIN. There was, the defendant had the keys to the car. There is nothing, it was concededly not illegal to have a registration sticker taped to the windshield. So, I mean, maybe if they had looked at the dashboard VIN at 721, I mean, if they had looked for the door jam VIN at 721, that would have been a reasonable thing to do. But after 722, it was not. Rodriguez cautions us once the goal of the stop is completed, there's no more for the officers to do. Absolutely, Your Honor. Thank you. Thank you. I've reserved my time for- You have reserved three minutes for about a, we'll hear from the government. Good morning. May it please the court. My name is Sagar Ravi, and I'm an Assistant United States Attorney in the Southern District of New York. I represented the government on appeal, and I represented the government in the proceedings below. So, you heard my question. The district court said the main issue was whether there was sufficient information in possession of the officers by 722 p.m. or so to mean that they should never have proceeded to the next step. And yet, she doesn't answer that in her opinion, unless you could point me where I've missed it. I think the court is right. I cannot point you to anything in the district court's opinion addressing that specific question. But I respectfully submit, Your Honors, that we don't need to answer that question, because under the Supreme Court's decisions in Clast and Rodriguez, it's settled law that during a lawful traffic stop, which we have here for a defective brake light, that the officers' inspections of VIN numbers, whether it's on the dashboard, invisible from the outside, or whether it's on the door jamb, is part of the ordinary incidence of a traffic stop that can be conducted without reasonable suspicion. But they looked at the VIN dashboard, and it matched whatever registration information was also there. They knew this car was not stolen at 722, didn't they? Well, a check was done by— Didn't they know it wasn't stolen? Well, I think Officer Haskovic testified that he did not know that it was not stolen at the time. There were two officers actually on the ground at the scene, Officers Haskovic and Officer Bonahan. And although someone did run a check at 722 of the database, there's no evidence in the record to show who actually reviewed that or what information they were able to review in the short period of time of the stop. But here, Clast and Rodriguez counsel that an officer, even without any reasonable suspicion— and in Clast, it was established that there was no suspicion at all that the car was stolen. But in Clast, isn't it a little bit different? Because there, the officer only checked the dashboard because he couldn't find the VIN in the door jamb. So here, you have the officers seeing the VIN in full. In Clast, you didn't. Well, in Clast, though, however, they did review—they first went to the door jamb. They actually did try to inspect it there, and then they went to the dashboard. But Clast went further and established that there is no reasonable expectation in the VINs of both the dashboard, which is visible from the outside, as well as the limited inquiry of the VIN on the door jamb. That was established by Supreme Court and is still good law after Rodriguez. I think, stepping back, Your Honors, the point here is that Clast and Rodriguez set a bright-line test as to what are ordinary incidents of a traffic stop for which you do not need a reasonable suspicion and that are part of the mission of the traffic stop. And here, a limited inquiry of the VINs, which occurred here, did satisfy and fall within that bright-line test of what are ordinary incidents. Once the dashboard VIN checks out and proves that he is the owner, according to the registration of that car, where does Rodriguez or Clast tell you that they can keep going until they look at the other VIN? What is there? Can they keep going even if the other VIN was there until they find something else? Can they keep going forever until they find something suspicious? They cannot keep going forever, Your Honor. As held in Rodriguez, a traffic stop mission is to address the traffic violation, which here was a defective brake light, as well as to attend to related safety concerns. And what was the traffic stop mission here? They thought after the one backlight didn't work, they thought it was stolen, and at some point they established that this wasn't a stolen car. Wasn't that their mission? Why would you keep going after you prove that he's the owner of the car? Well, the purpose of the traffic stop was the defective brake light. However, as soon as the officers approached, and this goes more to the argument about reasonable suspicion, but I do submit that there was reasonable suspicion here. But once they stopped him for the defective brake light, they approached him to the vehicle, and then they noticed tool marks on the top of the door that indicated that it might have been stolen. They thought it might be stolen, but at some point they knew this wasn't a stolen car. What right did they have? What articulable suspicion can they have enunciated after they knew it was his car and it wasn't stolen? Well, the record, Your Honor, is that Officer Haskovic testified that, first of all, although he was aware there was a rugby device present, that even a check of that rugby device and the database check would not have alleviated his concern that the car may be stolen in light of all the other factors. And let me go through them. Sure. Even assuming that Officer Haskovic knew that rugby check was there, that's a database check. It doesn't somehow change the nature of what the officers are seeing on the ground. But they knew it wasn't a stolen car at some point. At some point after the arrest had occurred. But up to that point, Officer Haskovic saw the tools. He then asked Mr. Wallace for his driver's license and registration, which, by the way, is required under New York law. That's what you need to provide. Mr. Wallace didn't have his registration. Putting that aside... It was on the car, though. Well, there was a registration sticker on the car, and that's what Officer Haskovic did. He methodically, when Mr. Wallace did not have his registration papers to provide, he then looked to the registration sticker on the windshield. And there was another indicia that the car might have been stolen because the registration sticker... I agree with all of this, but at some point they knew it wasn't stolen. Why did they continue the search after that point? That's my question. That's what the district court said was the main issue. Your Honor is right. The question is when did they think under the reasonable suspicion standard. When did they know and what did they know? Yes. And, Your Honor, I respectfully submit that based on the record in this case, reasonable suspicion that the car was stolen continued until after Mr. Wallace was arrested. On what basis? Again, the various indicia here of the fact that there is a rugby check of NYPD databases did not dispel the suspicion based on the other factors here. The officers methodically took limited steps in order to confirm or dispel their suspicions, which is what this court held in Gomez is the appropriate course of conduct. But Gomez found a violation of the Fourth Amendment, did it not? They did because the officers there were engaged immediately from the start. They detoured from the mission of the traffic stop into drug-related inquiries. The mission of this traffic stop was what? Tell me again. The mission of the traffic stop was to both investigate for the defective brake light and also to attend to related safety concerns, which includes whether or not a car is properly registered to the individual. No, I thought you told me it was whether to make sure the car was stolen or not. That is part of it. Whether or not a car is stolen is. And at some point, who didn't know that it wasn't stolen after they got the rugby report? Who was it that didn't know? It was officers Haskovic and Monaghan, the two officers who were actually on the ground. Defense counsel makes a lot about the fact that Sergeant Alston testified that the rugby report would indicate that it was not stolen. However, Sergeant Alston wasn't on the scene. He was sitting in the back of the police car during almost the entirety of the stop. And he never called out and said, hey, this car is not stolen when he got the rugby report? There was no evidence regarding the relaying of that information to the officers that were there and saw all of these indicia that led him to believe that the car was stolen. Put aside the rugby report. Once the officers saw the VIN on the dashboard, why did they also have to look at the door jamb? Again, in class, the reason that the officer went to look at the dashboard was because he couldn't see it in the door jamb. Here, Officer Haskovic believed that because Mr. Wallace couldn't provide his registration, because of the tool marks, because of the poor, what Officer Haskovic wanted to do is he wanted to compare the door jamb, sorry, the VIN on the dashboard, the public VIN, with the registration sticker because there's supposed to be a VIN on there. But that registration sticker was in such poor condition that he couldn't do that check. And as Officer Haskovic testified, he therefore went and asked Mr. Wallace, can I check the VIN on the door jamb? And that's what he did, and that's what led to the arrest. So it was a very limited, narrowly tailored inquiry based on the suspicion that he had that the car still may be stolen. I think as the Court has probably seen through reviewing these cases, it is not unusual for officers to check multiple VINs in order to confirm that they've matched. Checking until they find something wrong. Well, here we're talking about a very limited, we're not talking about every VIN across the vehicle. CLAS only extends to two specific VINs, which is the public VIN on the dashboard, as well as the door jamb. And that's all that's happened here. It falls squarely within the precedent of CLAS and Rodriguez for them to conduct that limited inquiry during a traffic stop. Unless the Court has other questions, the government rests on its submission. Thank you. Thank you, Counsel. Counsel, you have, I believe, three minutes for rebuttal. Yes, Your Honor. In the CLAS case, there was no issue regarding prolongation of a stop. The defendant in CLAS never claimed that the stop was prolonged. The CLAS case holds that a VIN check may be done during a lawful traffic stop. There is nothing in CLAS, nothing in Rodriguez, and nothing in any case cited by the government which holds that a traffic stop may be revived once it's finished in order to take a second look at another VIN number. Or to keep looking. Or to keep looking. Once the traffic stop is done, it's done. Rodriguez made that very clear in plain English. And even if there is no expectation or diminished expectation of privacy in VINs, there is an expectation of privacy in not being unlawfully detained once the traffic stop is done. And there is nothing in any case, not CLAS, not Rodriguez, not any case, that says that a traffic stop can be revived in order to, you know, continue with any routine incidents that the officer thinks he may have missed. When you say revived. You mean Rodriguez doesn't say you can keep looking until you find something bad? No, it doesn't say that. And, in fact, I think it's very clear that you can't do that. And, you know, focusing on the rugby report for a minute, if Haskovich and Monahan, who conducted the search, didn't know that the rugby report had been run, what was the harm in double checking that the VIN on the dashboard matched the VIN in the door jam in light of the various suspicious circumstances here? First of all, Officer Azcona, who was on the ground, and whose testimony was credited by the district court, testified that he gave the rugby to Officer Haskovich and received it back from Officer Haskovich, and there's certainly no testimony that Officer Haskovich gave it to anyone else. I think we can conclude that Officer Haskovich, despite his lack of recollection, did that rugby search. But even if it wasn't him, Sergeant Alston, who, even if he was not out of the police car, was at least on the scene, testified that it was the practice to review the important details of the rugby right away, the name, the date of birth, address, license, registration, VIN, and whether the car came up stolen. And whoever, you know, if this court were to hold that whoever did this rugby search can just keep it to himself and let the other officers poke around in the hope that they may find something, that would create an incentive to nullify Rodriguez, that an officer can do a search and then say, all right, I'll put this rugby on the seat. Let's look around for a few more minutes and see what happens. I don't think that's a result that Rodriguez contemplates or that this court or the Supreme Court would sanction. I'm out of time, Your Honor, so if there are no further questions, I'll rest on the briefs. Thank you. Thank you both. Judge Winter, do you have any questions before I allow these attorneys to leave? No, I don't. Can you hear me? Thank you. Thank you all. Well argued. Can you hear me? Can anyone hear me? Yes. I'm sorry. I'm sorry. What is the answer? I'm asking if you can hear me. I'm in the Roberts case and counsel apparently couldn't hear me. I'm having a hard time just figuring out. We can hear you now, Judge. Okay. Thank you. I won't be asking any questions. Thank you. The next case is United States of America versus . . . He wants one? Oh, I don't blame him.